herein the law provides a discretionary punishment of one year's imprisonment and a fine of $500, and also an obligatory punishment of a forfeiture of license, amounting to $800, and possibly a penalty under the bond given for nonviolation, of $1,600; and in addition to all this there is superimposed a reminder of the long ago abolished bill of attainder, in that the defendant cannot again follow his usual vocation of selling liquor for a period of five years. Thus, though the legislature calls such a violation a "misdemeanor," the punishment, which alone is the true test, stamps the crime as more than a misdemeanor. To my mind, therefore, it is reasonable, if a defendant desires, that a trial before a jury of the defendant's peers should be had before these direful consequences can be visited upon him. Nor can the fact, if it be a fact, as has been suggested, that a jury will probably acquit a defendant charged with violating the excise law, be urged with force as a reason for denying this application. If this law, or the punishment which is provided for its violation, so offends the sense of justice of the community that juries will even violate their oaths to acquit where the evidence of guilt is convincing, I can only regret it. To my mind, it is not reasonable to refuse a jury trial for such reason. I am aware that the district attorney opposes this motion, but no facts whatever and no argument which I deem reasonable or valid is advanced in support of his contention. I must therefore adhere to my former decisions, and remove these cases wherein, as in this case, both important property rights are involved, and a proprietor is charged with a violation of the excise law. The consequences which follow the conviction of an employé are by no means so severe, and in such applications now before me no unusual facts are brought to my attention which would justify me in granting their applications, and they will be accordingly denied.

Applications granted as to the proprietors, but denied as to the barkeepers and employés. Submit certificates accordingly. Ordered accordingly.

---

(36 Misc. Rep. 128.)

## In re SMITH'S WILL.

(Surrogate's Court, Tompkins County.   October, 1901.)

WILLS—UNDUE INFLUENCE.
    A widow 78 years old, who disliked to attend to business matters, gave to her attorney the care of the estate which she had received from her husband on his death, such attorney mingling her moneys with his own in his bank account, and she being accustomed to apply to him to get such moneys. He occasionally furnished her money, paid some of her bills, and entertained her at his home. *Held*, that a will in his favor will not be set aside for undue influence.

Proceedings to contest the will of Ann H. Smith, deceased. Probate decreed.

Monroe M. Sweetland (S. D. Halliday, of counsel), for proponent.
M. N. Tompkins, for Cazenovia Seminary, a legatee.
S. E. Banks, for Ann Stoddard, a legatee.
J. B. Stanchfield, for contestants.
J. & T. E. Courtney, for special guardian.

ALMY, S. The deceased was 78 years old when she made this will. From the time of her husband's death, which occurred some four years before, she had continued to occupy the farm where she and her husband had resided during most of their married life; and since the death of her husband, through the influence of advancing years, she grew more and more feeble, but was able until just before her death to go about, attend church, and do her own housework. In all these matters she undoubtedly went beyond her strength, and, besides being so old, was frail, emaciated, bowed, and tremulous. Still her mind did not undergo any important change other than the gradual weakening due to increasing age. She was very religious, and had a decided dislike for all business, and a repugnance to learning or becoming acquainted with business matters of her husband, and, when requested by him to pay attention to matters he wished to instruct her in with reference to his investments, she simply replied, "I can't understand it," and asked him to stop. This disinclination to matters of business, except in a few matters, seems to have continued, and when she received $20,000 from the estate of her husband in securities she did not undertake the care of them, but placed them in the hands of Mr. Davis, the proponent and principal legatee, and continued to live on in her exceedingly simple and economical way, leaving the management of her property, except the farm, to him. She took a great interest in church affairs and in religious matters, and the evidence does not disclose any circumstance where, in matters connected with subjects I have mentioned, she showed any incapacity of mind. There is evidence of forgetfulness in conversation, of a skimping and miserly economy in living, inconsistent with her means and liberality shown by her will, and witnesses express their opinion of some of these as irrational; yet in all the evidence there is not sufficient proof of lack of testamentary capacity. She was old, and feeble in mind and body. Her natural dislike or incapacity for business matters made her an easy prey to the influence of any one whom she trusted, and could easily have been deceived. But there is no evidence of the practice of deceit nor the exertion of undue influence upon the testator by Mr. Davis, the principal legatee. The furnishing, occasionally, of money for her requirements; looking up things for her comfort; paying for them, as well as paying her bills here in the city from her money; occasionally loaning her books and entertaining her at his house; presenting to her a fine picture of her late husband,—constitute the principal features of the evidence of the acts of Mr. Davis; and the conduct of the testatrix which it is contended indicates the influence of Mr. Davis over her is the mingling of her moneys with

his own in his bank account, and keeping no account from which she could obtain money without application to him, without protest or complaint from her, so far as the proof shows; and the fact that the testatrix, who, during her married life, showed a repugnance for business affairs, and declared her inability to understand them, actually wrote the will in question with her own hands. While these facts may be the ground for grave suspicions, they are not shown to be the result of misconduct on the part of Mr. Davis. Neither do the combined facts above stated establish, in my opinion, that the provisions of the will in behalf of the executor were obtained to be made by an improper influence exerted by him. It is true that in earlier years she was heard to speak of her relatives, and to express a desire that they might have her property, and mentioned one of them as the relative whom she wished to have her farm; but there is no proof that the change in her intention was brought about by Mr. Davis, unless the facts above stated shall be considered sufficient. In my judgment, they are not.

Much stress is put upon the relation of attorney and client that existed between Mr. Davis and Mrs. Smith from the time of her husband's death until her decease. Yet the most that can be required of an attorney under such circumstances, aside from the matter of his influence, is that he shall act openly, fairly, and honorably toward his client; and in the preparation of the will in question it is not shown that the attorney took any part. On the contrary, it appears that Mrs. Smith actually wrote this will from a draft made by Mr. Davis' stenographer, after specifications furnished by Mrs. Smith. The testatrix, therefore, must have known the provisions of the will, and, if I am right upon the questions of testamentary capacity and of undue influence, it must be the expression of her intention and desire respecting the disposition of her property. The will in question must be admitted to probate, and established as the valid will of the testatrix.

Probate decreed.